BUTLER COUNTY BAR ASSOCIATION *v.* MINAMYER.

[Cite as *Butler Cty. Bar Assn. v. Minamyer,*

129 Ohio St.3d 433, 2011-Ohio-3642.]

*Attorneys at law — Misconduct — Failure to inform client of lack of malpractice insurance — Neglect of legal matter — Failure to communicate with client — Dishonest statements to client — Mental-health issues as mitigating — One-year stayed suspension.*

(No. 2009-2284 — Submitted March 22, 2011 — Decided July 28, 2011.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 09-044.

_____

**Per Curiam**.

**{¶ 1}** Respondent, William Eric Minamyer of Loveland, Ohio, Attorney Registration No. 0015677, was admitted to the practice of law in Ohio in 1979.[1] In June 2009, relator, Butler County Bar Association, filed a four-count complaint charging respondent with multiple violations of the Code of Professional Responsibility and the Rules of Professional Conduct.[2]

**{¶ 2}** Respondent initially cooperated in relator's investigation. Although he was served with the complaint, he did not file an answer or otherwise respond to it. A master commissioner appointed by the Board of Commissioners

---

1. It appears that respondent is also licensed to practice law in Kentucky.

2. Relator charged respondent with misconduct under applicable rules for acts occurring before and after February 1, 2007, the effective date of the Rules of Professional Conduct, which supersede the Disciplinary Rules of the Code of Professional Responsibility. Although both the former and current rules are cited for the same acts, the allegations comprise a single continuing ethical violation. *Disciplinary Counsel v. Freeman*, 119 Ohio St.3d 330, 2008-Ohio-3836, 894 N.E.2d 31, ¶ 1, fn. 1.

on Grievances and Discipline granted relator's motion for default, making findings of fact and misconduct and recommending that respondent be suspended from the practice of law for one year with one year of probation following reinstatement, including the appointment of a monitor in accordance with Gov.Bar R. V(9)(B). The board adopted the master commissioner's findings of fact and conclusions of law but recommended a two-year suspension with the second year stayed for monitored probation. This court issued an order to show cause why the recommendation of the board should not be accepted by the court.

{¶ 3} Respondent responded to the show-cause order, seeking leave to introduce mitigating evidence that he sustained a traumatic brain injury while serving in the Navy Reserve Judge Advocate General's Corps and that he suffered from posttraumatic-stress disorder ("PTSD") as a result of his active military service. He also objected to the board's findings of fact.

{¶ 4} After oral argument, we remanded the matter to the board to receive and consider evidence regarding respondent's health conditions, and the board appointed a panel to comply with our order. As a result of those proceedings, the board issued a revised recommendation that respondent be suspended for two years with 18 months stayed on conditions, and respondent has once again filed objections.

{¶ 5} We adopt the board's findings of fact and misconduct because the record clearly and convincingly demonstrates that respondent (1) failed to notify his client that he did not carry malpractice insurance, (2) neglected that client's legal matter, (3) failed to communicate with the client regarding the status of her case, and (4) led the client to believe that her case was still pending after it had been dismissed for failure to prosecute. Because we accord greater weight to respondent's mitigating mental-health issues, however, we suspend respondent from the practice of law for one year but stay the entire suspension on conditions.

**Misconduct**

**{¶ 6}** During its investigation, relator deposed respondent and the grievant. The deposition testimony demonstrates that in April 2006, respondent filed a complaint on the grievant's behalf in the Butler County Court of Common Pleas. Although respondent received notice of and participated in a mediation session and unsuccessfully opposed defendant's counsel's motion for leave to withdraw as counsel, he failed to submit a pretrial statement or appear at the scheduled pretrial on August 30, 2007. And in September 2007, the trial court granted the defendant's unopposed motion to dismiss the complaint.

**{¶ 7}** When respondent learned of the dismissal, he advised the grievant that she did not need to appear for trial, without explaining that her case had been dismissed. From September to December 2007, when the grievant called respondent to discuss her case, he told her that he would send her something in the mail, but he never did. In December 2007, the grievant received a statement of court costs due and learned for the first time that her complaint had been dismissed.

**{¶ 8}** Respondent admitted that he had failed to advise the grievant that he did not carry malpractice insurance, but advanced various excuses for his neglect, including the misdirection of his mail by the court, an office move, and an illness. He offered no documentary evidence to corroborate his testimony.

**{¶ 9}** In its December 18, 2009 report granting relator's motion for default and in its December 9, 2010 report on remand, the board found that respondent had violated DR 1-104 and Prof.Cond.R. 1.4(c) (both requiring a lawyer to inform the client if the lawyer does not maintain professional-liability insurance), DR 6-101(A)(3) and Prof.Cond.R. 1.3 (both requiring a lawyer to act with reasonable diligence in representing a client), Prof.Cond.R. 1.4(a)(3) (requiring a lawyer to keep the client reasonably informed about the status of a matter), Prof.Cond.R. 1.4(a)(4) (requiring a lawyer to comply as soon as practicable with reasonable requests for information from the client), and DR 1-

102(A)(4) and Prof.Cond.R. 8.4(c) (both prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). We adopt these findings of fact and misconduct.

**Sanction**

{¶ 10} When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21.

{¶ 11} As aggravating factors, the board found that respondent had committed multiple ethical violations, had harmed his client, and had failed to cooperate in the disciplinary proceedings and that his failure to notify his client that her case had been dismissed was deceitful. See BCGD Proc.Reg. 10(B)(1)(d), (e), and (h). Although respondent testified that he suffered from depression, he did not substantiate his testimony with any medical records or testimony from his treating professionals.

{¶ 12} On remand, the panel appointed to receive and consider evidence regarding respondent's health conditions conducted a hearing, at which it heard respondent's testimony regarding his traumatic brain injury and PTSD, but neither party introduced any medical evidence regarding those conditions. Consequently, the board ordered respondent to submit to an independent psychiatric examination to determine if he suffered from mental illness.

{¶ 13} Citing the report of the independent psychiatric evaluator, Douglas Beech, M.D., the panel reluctantly found that respondent's diagnosed mental-

health condition qualified as a mitigating factor pursuant to BCGD Proc.Reg. 10(B)(2)(g), observing that "his attitude seemed to be 'to deny all wrongdoing, but if you don't believe me, then I suffer from a mental disability that accounts for my actions.' " While the board again recommended a two-year suspension from the practice of law, it concluded that 18 months of that suspension (rather than the 12 months it had previously recommended) be stayed on conditions.

{¶ 14} Respondent objects to the board's report and, citing Dr. Beech's conclusion that he did not timely defend himself due to his mental-health conditions, seeks an opportunity to address the merits of the underlying grievance. Specifically, respondent argues that his client's case was reinstated by the trial court based upon certain falsehoods committed by the defendant to the action and that his client later obtained a default judgment in her favor.

{¶ 15} We have stated that we grant remands to supplement the record "only under the most exceptional circumstances." See *Dayton Bar Assn. v. Stephan*, 108 Ohio St.3d 327, 2006-Ohio-1063, 843 N.E.2d 771, ¶ 5. We have already remanded this matter once to permit respondent to submit mitigating evidence of his mental disability. As a result of that remand, the record now contains evidence that his mental-health conditions played a significant role in his failure to timely respond to relator's complaint. The alleged misdeeds of the defendant in the underlying civil case cannot excuse respondent's deceit, failure to keep his client informed about the status of her case, failure to respond to her reasonable requests for information, and failure to timely seek relief from the judgment dismissing her case, all of which have been proven by clear and convincing evidence. Nor can they excuse his admitted failure to inform the client that he did not carry malpractice insurance. Because respondent has not demonstrated any exceptional circumstances warranting a second remand, we overrule this objection and adopt the board's findings of fact and misconduct.

**{¶ 16}** In the alternative, respondent seeks a fully stayed suspension based upon the successful and ongoing treatment of his PTSD, depression, and traumatic brain injury, combined with the measures he has taken to safeguard his practice and the appointment of a practice monitor.

**{¶ 17}** After reading the record in this case, reviewing respondent's medical records, and interviewing and examining respondent, Dr. Beech submitted a report to the panel. In that report, he found:

**{¶ 18}** "[Respondent] began receiving treatment in 2002 following an incident of trauma while working overseas in the Navy reserves. The helicopter he was a passenger in made a crash landing on a naval vessel and he suffered a head injury and loss of consciousness as a result. Preceding the crash was a period of intense anxiety as a realistic threat of death existed as a result of the tenuous circumstances. He subsequently experienced a depressive episode and substantial anxiety. Over ensuing months he developed classic symptoms of post traumatic stress disorder (PTSD) (traumatic re-experiencing ['flashbacks'], phobic avoidance, night terrors, insomnia, and generalized anxiety). He was initially prescribed the antidepressant Celexa which was helpful for depressive symptoms and anxiety. He subsequently underwent individual psychotherapy for PTSD symptoms which was very helpful to him as well. Though the symptoms of depression and PTSD have fluctuated and still persist, his symptoms have been generally well-managed, exacerbated in times of increased external stress. His depression has been moderately worse in the past year, as the recent revelations about additional injuries and impairments have led him to feel more depressed.

**{¶ 19}** "Additionally [respondent] was evaluated last year at the [Veterans Health Administration] medical center and diagnosed as having residual cognitive deficits attributable to a traumatic brain injury. He has been engaged in treatment and rehabilitation there to better define his cognitive deficits and maximize his strengths."

**{¶ 20}** Dr. Beech found that respondent's PTSD and depression played a significant role in his failure to timely respond to relator's complaint and, to a lesser extent, contributed to his underlying misconduct. He concluded that by combining outpatient treatment and pharmacological management with a reduced caseload and the appointment of a practice monitor, respondent could continue to practice law in a safe and responsible manner.

**{¶ 21}** We are ever mindful that the primary purpose of the disciplinary process is not to punish the offender but to protect the public from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship. *Disciplinary Counsel v. Agopian*, 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368.

**{¶ 22}** Since respondent was first diagnosed with depression, PTSD, and traumatic brain injury, he has received substantial treatment. He has taken a prescribed antidepressant, participated in individual psychotherapy, and participated in various forms of rehabilitation, including speech therapy and mental exercises to improve his memory. Recognizing the seriousness of his conditions, respondent has also taken significant measures to ensure that his cognitive deficits will not have any negative effect on his clients. He has reduced the number of clients that he represents, uses a recorder, takes notes, and communicates with his clients by e-mail as much as possible. He has also limited the scope of his practice to domestic relations, general litigation, and labor law.

**{¶ 23}** This is the first disciplinary action that respondent has faced in his more than 30 years of practice, and it involves respondent's conduct with respect to a single client matter. See BCGD Proc.Reg. 10(B)(2)(a) (providing that absence of a prior disciplinary record is a factor that may be considered in favor of a lesser sanction). And having observed respondent's reasoned and articulate presentation at oral argument, we find his expressions of remorse and contrition to be genuine.

**{¶ 24}** Taking into account respondent's diagnoses, his treatment, and his remedial actions, we do not believe that an actual suspension is necessary to protect the public from future harm. Moreover, at oral argument, both of the parties agreed that a two-year suspension, all stayed on conditions, would adequately protect the public.

**{¶ 25}** In *Toledo Bar Assn. v. Lowden*, 105 Ohio St.3d 377, 2005-Ohio-2162, 826 N.E.2d 836, ¶ 4, 7, we disciplined an attorney who had neglected two separate client matters, failed to carry out his contract of professional employment in those matters, and failed to cooperate in the resulting disciplinary investigations. He had also falsely signed a client's name on four support schedules, notarized them as genuine, and filed them with the domestic relations court. Id. at ¶ 2. Although we recognized that a violation of DR 1-102(A)(4) generally requires an actual suspension from the practice of law for the public's protection, we observed that "BCGD Proc.Reg. 10(B)(2)(g) permits us to temper the sanction we impose for a lawyer's dishonesty to a client and court upon proof that mental disability caused the misconduct, under some circumstances." Id. at ¶ 19. Citing as a mitigating factor the attorney's documented bipolar disorder and his willingness to commit to treatment, we imposed a two-year, fully stayed suspension on the condition that he continue his mental-health treatment and provide quarterly reports to relator during the stay. Id. at ¶ 20-21.

**{¶ 26}** Unlike *Lowden,* which involved two separate client matters, this is a case of a respondent's first disciplinary action in an otherwise unblemished 30-year legal career, and involves a single client matter. Moreover, as noted previously, respondent's conduct was born of his extensive mental-health problems, and his reasoned and articulate presentation at oral argument persuaded this court that his expressions of remorse and contrition are genuine.

**{¶ 27}** Accordingly, we adopt the board's findings of fact and misconduct but suspend respondent from the practice of law in Ohio for one year, with the

entire suspension stayed on the conditions that he (1) serve one year of probation to be supervised by a monitor appointed by relator in accordance with Gov.Bar R. V(9), (2) limit his practice to domestic relations, general litigation, and labor law (a condition imposed at his own request), (3) continue to follow the recommendations of his treating professionals, including ongoing pharmacological management by his treating physician, and (4) commit no further misconduct. If respondent fails to comply with these conditions, the stay will be lifted, and respondent will serve the entire one-year suspension. Costs are taxed to respondent.

Judgment accordingly.

PFEIFER, O'DONNELL, and MCGEE BROWN, JJ., concur.

LUNDBERG STRATTON, J., concurs separately.

O'CONNOR, C.J., and LANZINGER and CUPP, JJ., would order a two-year suspension from the practice of law, all stayed on conditions.

_____

**LUNDBERG STRATTON, J., concurring.**

{¶ 28} While I concur in the sanction in this matter, I write separately to highlight the failure on remand of the examining psychiatrist to adequately address the effects of respondent's traumatic brain injury ("TBI") and posttraumatic-stress disorder ("PTSD") on his fitness to practice law. This case is symbolic of the problem many veterans face as they return from war with TBI/PTSD. Too often, the medical community fails to recognize how TBI differs from PTSD, to distinguish between the physical and psychological symptoms of TBI, and to appreciate that although TBI has psychological symptoms, it is a medical condition with real consequences.

{¶ 29} American service members have sacrificed greatly, most recently in the battles in Afghanistan and Iraq. More than 1.6 million American service members have deployed to Iraq and Afghanistan in Operation Iraqi Freedom and

Operation Enduring Freedom, and over 565,000 have deployed more than once. National Council on Disability, Invisible Wounds: Serving Service Members and Veterans with PTSD and TBI (Mar. 4, 2009) 1, 8, available at http://www.ncd.gov/newsroom/ publications/2009.

{¶ 30} Many of our veterans who have returned are still fighting the psychological effects of war. Id. An estimated 25 to 40 percent of returning veterans have psychological and neurological injuries associated with PTSD or TBI, which have been called the "signature injuries" of the Iraq war. Christopher Munsey, A Long Road Back (June 2007), 38 Monitor on Psychology 34.

{¶ 31} "It is common to make a distinction between visible injuries such as orthopedic injuries, burns, and shrapnel wounds and less visible injuries such as PTSD. The distinction often is characterized as 'physical' versus 'mental' injuries. These terms imply that PTSD somehow is not physical. However, this is an artificial distinction. PTSD and other 'mental illnesses' are characterized by measurable changes in the brain and in the hormonal and immune systems." Invisible Wounds at 8.

### Definition of PTSD/TBI

*Posttraumatic-Stress Disorder*

{¶ 32} The Diagnostic and Statistical Manual of Mental Disorders (4th Ed.2000), the publication that defines the criteria used in diagnosing mental disorders, classifies PTSD as an anxiety disorder that arises from "exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or witnessing an event that involves death, injury, or a threat to the physical integrity of another person." Id., 463, Section 309.81. According to current estimates, between 10 and 30 percent of service members will develop PTSD within a year of leaving combat. When depression, generalized anxiety

disorder, and substance abuse are considered, the number increases to between 16 and 49 percent. Invisible Wounds at 2.

*Traumatic Brain Injury*

{¶ 33} TBI, which is a medical diagnosis rather than a psychological diagnosis, is a "traumatically-induced structural injury and/or physiological disruption of brain function as a result of an external force that is indicated by new onset or worsening of at least one of the following clinical signs, immediately following the event: (1) Any period of loss, or a decreased level, of consciousness. (2) Any loss of memory for events immediately before or after the injury. (3) Any alteration in mental state at the time of the injury (confusion, disorientation, slowed thinking, etc.). (4) Neurological deficits (weakness, loss of balance, change in vision, praxis, paresis/plegia, sensory loss, aphasia, etc.) that may or may not be transient. (5) Intracranial lesion." Office of the Surgeon General, Proponency Office for Rehabilitation and Reintegration, "Army TBI Program, Department of Defense Definition for TBI" (Feb. 2009), Slide 12.

{¶ 34} In veterans of recent wars, TBI is commonly caused by improvised explosive devices, or IEDs, the makeshift bombs insurgents frequently use to attack United States forces. A Long Road Back, 38 Monitor on Psychology 34. However, in respondent's case, the injuries were caused when the helicopter he was in crashed into a naval vessel while attempting to land on the vessel in the Indian Ocean.

{¶ 35} "Some surveys indicate that between 10 and 20 percent of soldiers returning from deployments might have suffered a mild TBI." Id.. The military estimates that one-fifth of the troops with these mild injuries will have prolonged—even lifelong—symptoms requiring continuing care. They may have cognitive issues such as difficulty in thinking, memory problems, attention deficit, mood swings, frustrations, headaches, fatigue, or many other symptoms. Invisible Wounds at 20.

{¶ 36} "Patients with a moderate to severe TBI might need physical therapy to learn such basic skills as how to get up in the morning and put their clothes on or how to walk smoothly again. * * * Motivation can also be a challenge, especially as patients become more aware of their impaired cognitive functioning. * * * [A]nger and depression can set in, as patients start to understand the scope of the challenge they face. * * * Dealing with a patient who already has a decreased ability to cope and concentrate because of PTSD—combined with the cognitive difficulties of a TBI—isn't something psychologists often encounter in the civilian world * * *." A Long Road Back, 38 Monitor on Psychology 34.

{¶ 37} In addition to medical symptoms like altered consciousness, seizures, infections, nerve damage, and sensory problems, persons with TBI also experience cognitive, communication, behavioral, emotional, and sensory problems. www.mayoclinic.com/health/traumatic-brain-injury/DS00552/DSECTION=complications. Cognitive problems can include difficulties with memory, learning, reasoning, problem-solving, speed of mental processing, judgment, attention or concentration, multitasking, organization, decision-making, and beginning and/or completing tasks. Id.

{¶ 38} Language and communication problems are common following TBI and may include difficulty understanding or producing spoken and written language (aphasia), difficulty deciphering nonverbal signals, inability to organize thoughts and ideas, inability to use the muscles needed to form words (dysarthria), problems with changes in tone, pitch, or emphasis to express emotions, attitudes or subtle differences in meaning, trouble starting or stopping conversations, trouble with turn-taking or topic selection, trouble reading cues from listeners, and trouble following conversations. Id.

{¶ 39} Behavioral changes may include difficulty with self-control, lack of awareness of abilities, risky behavior, inaccurate self-image, difficulty in social

situations, and verbal or physical outbursts. Id. Emotional changes may include depression, anxiety, mood swings, irritability, lack of empathy for others, and lack of motivation. Id. Most people who have had significant brain injury will require rehabilitation. They may need to relearn basic skills, such as walking or talking. Id.

**Respondent's PTSD/TBI**

{¶ 40} Respondent began receiving treatment in 2002, following an incident of trauma while working overseas in the Navy Reserves. Respondent described the trauma in this way in his response to our January 2010 show-cause order:

{¶ 41} "In early February 2002 I transited from USS Bainbridge to USS Peterson in the Indian Ocean off Somalia at maximum range with no reciprocal fuel supply. The seas and winds were very bad and the Captain at first would not allow us to try to land. We circled the ship for over an hour to exhaust our fuel to minimize the possibility of fire. I was terrified by the prospect of crashing into the sea if we could not land on the ship.

{¶ 42} "When we finally tried to land the wind caused us to come out of line and the ship came up and hit the helicopter. It was at a minimum a very rough landing in which I struck my head, losing consciousness. Afterward I fell down in my quarters and vomited. Once we got to the Seychelles I got a hotel room so I could recover. * * *

{¶ 43} "I have been troubled by night terrors from the middle of February 2002 until the present, although they are less frequent. Whenever I was home from overseas assignment my family noticed serious problems I was having sleeping, working and adjusting in general. I finally sought psychological counseling * * * [and was diagnosed with] Post Traumatic Stress disorder following a depression diagnosis by my primary care physician.

{¶ 44} " * * *

**{¶ 45}** "Since discovering these conditions I have altered my practice by hiring my daughter as a paralegal to aid me in staying organized and managing my time. I also underwent speech therapy. The VA doctor also identified nerve damage to the left side of my body and face, caused by the helicopter accident. Further, I am currently in the eighth week of a twelve-week cognitive therapy regimen at the PTSD clinic in Ft. Thomas, Kentucky. * * *

**{¶ 46}** "All of these recent revelations have been very depressing. I know I should have been engaged in addressing the issues before the Grievance Commission, but I felt overwhelmed and was unable to deal with it. The PTSD therapy is helping me to cope with these personal matters. I am truly sorry that I did not do all that I should have done in responding to the committee. If given the chance I will cooperate fully and submit to any physical or psychological testing requested of me. I will provide whatever medical records not [sic] already provided.

**{¶ 47}** "I apologize to both the Commissioners and this Court for my condition leading to my recent lack of responsiveness."

**{¶ 48}** In addition to respondent's description, according to a case-management and biopsychosocial assessment, after respondent's accident, he reported that he had lost consciousness for a few minutes and was dazed, confused, and disoriented after he regained consciousness. Further, respondent reportedly experienced the onset of headaches after he resumed consciousness, and he noticed a knot of tissue at the right rear side of his scalp. Respondent was evacuated from the helicopter, briefly evaluated, and given some Tylenol. He experienced ringing in his ears after the impact and later experienced difficulty reading and using computers.

**{¶ 49}** Respondent's medical records indicate that he had recently screened positive for postconcussion syndrome due to TBI, secondary to an incident involving a helicopter and a ship at sea to which he had been deployed to

conduct a Navy investigation. Respondent also had reported that he had noticed difficulty reading and difficulty using computers after he sustained the concussion. In addition, respondent reported that he noticed new-onset difficulty remembering written testimony during that investigation at sea. He further reported problems in remembering appointments, performing "to-do" items, remembering people he speaks with, and remembering the content of his reading. He also reported headaches, including symptoms entirely new after the helicopter incident at sea.

{¶ 50} In October 2009, respondent reported that in the preceding month, he had experienced disturbing memories, thoughts, or images of his stressful experience, disturbing dreams of the stressful experience, feeling upset when something reminded him of the stressful experience, having physical reactions when something reminded him of the stressful experience, avoiding thinking about or talking about the stressful experience, avoiding activities or situations that reminded him of the stressful experience, loss of interest in activities he used to enjoy, feeling distant or cut off from other people, trouble falling or staying asleep, difficulty concentrating, feeling jumpy or easily startled, and being "superalert" or watchful or on guard.

### Remand for Consideration of Evidence Regarding
### Respondent's Health Conditions

{¶ 51} As noted by the majority opinion, in March 2010, this court ordered that this matter be remanded to the Board of Commissioners on Grievances and Discipline for consideration of evidence to be submitted by the parties regarding respondent's health conditions. On remand, the examining psychiatrist, Douglas Beech, M.D., issued a four-and-a-half-page report based on his one-hour-and-forty-five-minute interview with and examination of respondent. Based on available data and on a current psychiatric evaluation, as stated in his November 8, 2010 report, Dr. Beech diagnosed respondent with major depressive

disorder, recurrent, in remission, and PTSD, chronic, in partial remission. In addition, Dr. Beech diagnosed TBI and trauma-related neuropathy.

{¶ 52} Although Dr. Beech noted in his report that he had been retained to evaluate respondent's mental health, he devoted very little of his report to addressing respondent's TBI. In fact, in the four-and-a-half-page report, he acknowledged TBI in only three sentences, including the following: "Additionally, Mr. Minamyer was evaluated last year at the VA medical center and diagnosed as having some residual cognitive deficits attributable to a traumatic brain injury. He has been engaged in treatment and rehabilitation there to better define his cognitive deficits and maximize his strengths." Dr. Beech performed no meaningful analysis of the effects of TBI on respondent's practice.

{¶ 53} In fact, Dr. Beech concluded: "[A]lthough Mr. Minamyer does have two significant mental disorders, his mental health difficulties likely played only a modest role in the alleged misconduct in his handling of the [client] matter. To whatever degree he was neglectful of his duties in the case, his conditions likely played a contributory, but not a primary role. The most significant role played by his conditions was his avoidance of responding to the complaint in a timely manner."

{¶ 54} Correspondingly, it appears that respondent's lack of response to the complaint in a timely manner was much of the focus of the June 28, 2010 hearing before the Board of Commissioners on Grievances and Discipline. Rather than addressing how respondent's health and mental-health diagnoses affected his practice of law, the hearing seemed to focus more on the consternation of the panel and the relator regarding respondent's initial lack of participation in the disciplinary process.

{¶ 55} Relator's counsel asked, "Isn't it fair to say also that you, through your behavior, have obstructed our Bar Association from investigating these very facts by failing to cooperate in the initial litigation and in the litigation after the

remand?" When respondent noted that he was not trying to hide that he had engaged in irresponsible behavior, but that the reason for that behavior was the TBI and the PTSD, relator's counsel asked: "And would you agree that the consequences of that behavior was our inability to investigate the very things that you're talking about here today?" Respondent answered, "Well, that's true, but that's kind of circular. Because the mental condition, itself, is the cause of the problem being able to investigate the mental condition."

{¶ 56} The transcript records the ensuing exchange:

{¶ 57} "Q [relator's counsel]. * * * Would you agree with me that your failure to participate in the initial litigation in the Supreme Court prevented us from investigating the very things that you're talking about here today?

{¶ 58} "A [respondent]. No, because I offered to give you a release at our last meeting, and you never asked for it.

{¶ 59} "Q. Okay.

{¶ 60} "A. And I gave you all the medical records that I had up till that point. So even if, you know, you had everything that was available at the time, and I had offered to give you access to everything I've—every medical record I've ever had.

{¶ 61} "Q. So says you. But, again, you're a lawyer, so you know we have an adversarial system, right?

{¶ 62} "A. Are you denying it, that I said that to you in the Supreme Court room?

{¶ 63} "Q. I'm asking questions, and I'm asking for your answers.

{¶ 64} "A. Well, but you're asking a question that assumes something that's not really true, and you know it.

{¶ 65} "Q. You provided us stuff, but have we been able to dig in and do our own investigation? Have we been able to do that?

{¶ 66} "A. You could have.

{¶ 67} "Q. Okay."

{¶ 68} The panel's and board's further irritation with respondent's lack of involvement with the disciplinary process is indicated by relator's response to respondent's response to the show-cause order: "He minimizes his conduct and refuses to take responsibility for his actions. The language in the December 18, 2009 Findings of Fact, Conclusions of Law and Recommendation by the hearing panel is on target: 'The panel found Respondent unwilling to take responsibility for his conduct. Respondent had an excuse for everything, and his attitude seemed to be "to deny all wrongdoing, but if you don't believe me, then I suffer from a mental disability that accounts for my actions."' "

{¶ 69} In my view, respondent's mental-health issues were not fully and thoroughly considered initially or on remand.

**Conclusion**

{¶ 70} In the words of an injured veteran, " 'The war is done for me now. The days of standing in the hot desert sun, setting up ambushes on the sides of mountains and washing the blood from my friend's gear are over. The battles with bombs, bullets, and blood are a thing of the past. I still constantly fight a battle that rages inside my head.' Brian McGough, a 32-year-old Army staff sergeant whose convoy was attacked with IEDs in 2006. From his blog 'Inside My Broken Skull.' " Invisible Wounds at 8.

{¶ 71} The intent of this court in remanding this case was for consideration of evidence to be submitted by the parties regarding respondent's health conditions. Dr. Beech's scant treatment of the issue in his letter to the Board of Commissioners on Grievances and Discipline is not helpful to our decision-making but is illustrative of what is often the medical community's inadequate treatment of these issues. The psychiatrist's report and the findings of the board show a clear lack of understanding and appreciation of the effects of PTSD/TBI on respondent's behavior. Indeed, his failure to deal with the charges

18

is interpreted as deliberate, when in fact it is one of the very symptoms of his injuries. I write in the hopes of bringing a greater understanding to the judicial system of these relatively new issues that we will continue to confront as more veterans return from war with these injuries.

{¶ 72} I believe that the examining psychiatrist failed in his duty to adequately address the effects of respondent's PTSD/TBI on his fitness to practice law and that the board failed to understand and appreciate the effects of PTSD and TBI on respondent's behavior and his ability to cope.

{¶ 73} Respondent has taken action to treat his injuries. He has been undergoing treatment through the Department of Veterans Affairs for his visible and nonvisible injuries. He has been working on his gait. He has been working with a speech therapist at the VA. In addition, because he had been having difficulty putting sentences together, he went back to school to rehabilitate his mental processes. In his law office, he has cut back on the time he spends at his practice, has not taken on new clients, and has his daughter assist him in law-office management.

{¶ 74} Because the human brain is so complicated, it is extremely difficult to predict the long-term effects of any TBI. Most cases of mild TBI will resolve over time with minimal problems. In the case of more serious TBIs, a person can experience any number of changes over the course of months and years. http://www.brainline.org/content/2008/08/frequently-asked-questions.html.

{¶ 75} "A number of factors, including Glasgow coma scale (GCS) score, age, pupillary response and size, hypoxia, hyperthermia, and high intracranial pressure, may play an important role in predicting the outcome of traumatic brain injury. Eight hundred forty-six cases of severe traumatic brain injury (GCS≤8) were analyzed retrospectively to clarify the effects of multiple factors on the prognosis of patients. At 1 year after injury, the outcomes in these cases were as follows: good recovery, 31.56%; moderate disability, 14.07%; severe disability

24.35%; vegetative status, 0.59%; and death, 29.43%." Ji-Yao Jiang, Guo-Yi Gao, Wei-Ping Li, Ming-Kun Yu, and Cheng Zhu, Early Indicators of Prognosis in 846 Cases of Severe Traumatic Brain Injury (July 2002), 19 Journal of Neurotrauma 869, abstract available at http://www.liebertonline.com/doi /abs/10.1089/ 08977150260190456.

{¶ 76} With proper treatment, such as that which respondent has been seeking, people with PTSD/TBI can improve the way their brain functions, and they can often reclaim the portions of their lives that were affected by their injuries.

{¶ 77} This is respondent's first disciplinary action in an otherwise unblemished 30-year legal career. Based on the facts of this case, the single incident of misconduct and the extensive mental-health mitigation, I concur in the majority's decision to suspend respondent from the practice of law for one year with the entire suspension stayed on conditions. Further, because respondent has been actively engaged in treatment and because we can monitor his progress through a stayed suspension, I concur in the monitored-probation portion of the sanction but would hope that the monitoring of his compliance is done with a full appreciation and understanding of his wounds of war.

––––––––––––––––––

Bennett A. Manning and Christopher J. Pagan, for relator.

William Eric Minamyer, pro se.

––––––––––––––––––